```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
IMH BROADWAY TOWER SENIOR LENDER,   :
LLC, ET AL.                         :
                                    :
        Plaintiffs,                 :
                                    :         19-cv-8168(JSR)
        -v-                         :
                                    :         OPINION AND ORDER
WILLIAM HERTZ, ET AL.               :
                                    :
        Defendants.                 :
------------------------------------x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE LFD: 11/15/19

JED S. RAKOFF, U.S.D.J.

Defendants move under Fed. R. Civ. P. 12(b)(6) to dismiss Counts Three and Four of plaintiffs' breach-of-contract complaint. For the following reasons, the motion to dismiss Count Three is granted without prejudice to repleading. The motion to dismiss Count Four is denied.

Plaintiffs in this action are the successors-in-interest to the lenders of two secured loans issued for the purchase of a commercial real estate property — the "Tower" — in St. Louis, Missouri. Compl. ¶¶ 33-34, 49-50. Defendants are three individuals who personally guaranteed the borrowers' obligations under these loans. Compl. ¶¶ 28-31, 45-48. The borrowers defaulted on both loans in September 2018, Compl. ¶¶ 55-65, and plaintiffs are now pursuing defendants for the unpaid balances, Compl. ¶¶ 51-54.

1

The first transaction at issue in this dispute — the "Tower Loan" — is a $16.7 million loan issued by JP Morgan Chase Bank ("Chase") to Hertz Broadway Tower, LLC (the "Tower Borrower"), secured by a mortgage on the Tower. Compl. ¶¶ 17-27. Plaintiff IMH Broadway Tower Senior Lender, LLC is the successor to Chase on this loan. The second transaction — the "Mezz Loan" — is a $7.625 million loan issued by Chase to Hertz Broadway Tower Mezzanine, LLC (the "Mezz Borrower"), which is the parent of Tower Borrower. The Mezz Loan was secured by Mezz Borrower's equity in Tower Borrower. Compl. ¶¶ 35-44. Plaintiff IMH Broadway Tower Mezz Lender, LLC is the successor to Chase on the Mezz Loan.[1]

After the borrowers defaulted, plaintiffs foreclosed on the collateral securing the Mezz Loan, i.e., the equity of Tower Borrower. In May 2019, plaintiff IMH Mezz Lender held a UCC sale of this collateral and purchased it for a credit bid of $500,000. Compl. ¶¶ 69-70. Plaintiffs have not foreclosed on the Tower itself, though they effectively own the entire residual interest in the Tower through their ownership of the equity of Tower Borrower. See Mot. at 4-5. Plaintiffs now seek to recover

---

[1] The sequence of transactions through which the two IMH entities became the successors to Chase's interests in these loans is not relevant to this motion. See Compl. ¶¶ 32-34, 49-50, 55-65 & 66-70; Mem. Of Law in Supp. of Defs.' Partial Mot. to Dismiss the Compl., ECF No. 24, at 1-4 [hereinafter "Mot."].

2

from the guarantors a sum of just under $22.5 million, consisting of the $7,990,632.78 deficiency on the Mezz Loan (i.e., the balance of $8,490,632.78 less the $500,000 credit bid) plus an unpaid balance of $14,459,524.01 on the Tower Loan. See Compl. ¶¶ 51-54.

Both the Tower Loan and the Mezz Loan are limited recourse loans, that is, the contracts underlying both transactions provide that, in most circumstances, the lender's only remedy in the event of a default by the borrower is foreclosure and sale of the collateral. Mot. at 1. However, § 9.3(g) of each lending agreement enumerates certain exceptions to the non-recourse provision that, if triggered, allow the lender to pursue the other assets of the borrowers and the guarantors. Compl. Ex. 1 at 96-97; Ex. 13 at 90-91. This section, which is identical in both lending agreements,[2] provides in relevant part that:

> The [non-recourse] provisions of this Section shall not . . . constitute a waiver of the right of the Lender to enforce the liability and obligation of Borrower, by money judgment

---

[2] Because the language of § 9.3(g) of the Tower Loan agreement is identical to § 9.3(g) of the Mezz Loan agreement, this Opinion refers to § 9.3(g) as a single provision. Compare Compl. Ex. 1 at 96-97 with Compl. Ex. 13 at 90-91. Additionally, while the text of § 9.3(g) refers only to the obligations of the borrowers, separate guarantee agreements make defendants jointly and severally liable for any obligations of the borrowers under the Tower Loan and Mezz Loan agreements. See Compl. Exs. 7 & 19. These are the contracts that defendants allegedly breached. Compl. ¶¶ 71-82. As shorthand, however, this Opinion discusses the alleged obligations of the defendants as arising from § 9.3(g).

3

or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by the Lender . . . arising out of or in connection with the following:

. . .

(iii) material physical waste of the Property by Borrower, Guarantor or Manager; . . . [or] . . .

(vi) failure to pay charges for labor or materials or other charges or judgments that can create Liens on any portion of the Property (to the extent sufficient funds from the operation of the Property are available to do so) . . . .

Count Three of plaintiffs' complaint, ¶¶ 84-85, 101-107, alleges that the Hertz entities (as the borrowers and previous owners of the property) failed to pay obligations to various vendors and tenants totaling about $1.2 million, and that the guarantors are personally responsible for this amount under § 9.3(g)(vi). Count Four, Compl. ¶¶ 87-89, 108-112, alleges that the Hertz entities improperly deferred about $1 million of required maintenance to the building's elevator and HVAC system and also failed to make about $4.8 million of required payments into the building's maintenance reserve fund.[3] These omissions, according to the complaint, triggered the § 9.3(g)(iii)

---

[3] The language in the Complaint, ¶¶ 85-87, is ambiguous as to whether the Hertz entities underpaid into the reserve fund by $4.8 million or whether they failed to maintain a required balance in excess of $4.8 million. This ambiguity is ultimately an issue of damages, however, which the Court need not resolve at the motion-to-dismiss stage.

4

exception to the non-recourse provision for "material physical waste."[4]

Defendants now move to dismiss Counts Three and Four for failure to state a claim. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). After discarding allegations that amount to nothing more than legal conclusions, see Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), the court should "accept as true" what remains and "draw all reasonable inferences in plaintiff's favor." Beazley Ins. Co., Inc. v. Ace Am. Ins. Co., 150 F. Supp. 3d 345, 354 (S.D.N.Y. 2015) (citing In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007)).

Defendants first argue that, as a threshold matter, the Court must dismiss Counts Three and Four because plaintiffs have not alleged "any loss, damage, cost, expense, liability, claim or other obligation incurred by the Lender," which is a

---

[4] This motion does not seek to dismiss Counts One and Two, which each allege that guarantors are liable under a different exception to the non-recourse provision. Compl.: ¶¶ 93-100. A fifth count, also not at issue in this motion, is for attorneys' fees and costs. Compl. ¶¶ 113-116.

5

necessary condition for liability under § 9.3(g). In defendants' view, the unpaid vendor liabilities and deferred maintenance expenses could only have imposed "losses" on plaintiff IMH Mezz Lender in its capacity as equity holder of Tower Borrower, i.e., as the successor to the <u>borrower</u> of the Mezz Loan, while § 9.3(g) allows either plaintiff only to bring a claim in its capacity as <u>lender</u>. Mot. at 7-8. Plaintiffs respond that IMH Mezz lender "stepped into the shoes" of Mezz Borrower upon purchase of the Mezz Collateral, thus incurring liability for the vendor and maintenance expenses sufficient to constitute a "loss" under § 9.3(g). Pls' Opp'n to Defs.' Partial Mot. to Dismiss the Compl., ECF No. 28, at 9-10 [hereinafter "Answer"].

The Court agrees with plaintiffs that the language of § 9.3(g) permits them to bring claims against the guarantors for "losses" suffered in plaintiffs' capacity as purchasers of the collateral. The Court, after considering the language, context, and purpose of this section, concludes that the unambiguous meaning of "loss" and the accompanying terms in § 9.3(g) is an expense of the kinds enumerated in paragraphs (i) through (xi) of § 9.3(g) that impairs the lenders' security interests in the collateral. Assuming that plaintiffs are undersecured, § 9.3(g) does not distinguish between a situation where the plaintiffs sell the collateral to a third party, resulting in a deficiency, and a situation where plaintiffs keep the collateral for

6

themselves in partial satisfaction of the debt. In either situation, § 9.3(g), if triggered by any of the criteria listed in paragraphs (i) through (xi), would allow plaintiffs to pursue the guarantors for the difference between the value of the collateral and the outstanding loan balance. Defendants' reading would, in effect, extinguish any claim under § 9.3(g) in a situation where plaintiffs keep the collateral for themselves — hence becoming the successors to the borrowers of the loan — and this result would be totally at odds with the language and purpose of § 9.3(g).

The Court's reading of § 9.3(g), however, raises an additional issue. To state a breach of contract claim against the guarantors arising out of a § 9.3(g) obligation, plaintiffs must plausibly allege that they were, in fact, undersecured; and any recovery under this section may be no greater than the amount by which plaintiffs were undersecured. Allowing plaintiffs to collect anything from the guarantors in excess of that amount would, in effect, permit double recovery on the loans, a result equally contrary to the language of § 9.3(g) as the result discussed above.

As to the Tower Loan, plaintiffs have not alleged that they were undersecured by an amount equal to or greater than the value they seek to collect from defendants. Plaintiffs seek to recover from the guarantors the entire outstanding loan balance

7

of $14,459,524.01. Compl. ¶¶ 52, 93-96. But plaintiffs have also assumed indirect ownership of the collateral, i.e., the Tower, through their equity interest in Tower Borrower. See Compl. ¶¶ 69-70. If the value of the Tower is anything greater than zero, therefore, allowing plaintiffs to collect the entire loan balance from guarantors would result in some amount of double-recovery. The Complaint does not allege what the Tower's value may be, but nothing in the Complaint allows the Court to infer that the value is zero. Therefore, plaintiffs have failed to allege a "loss" commensurate with the amount they seek to recover with respect to the Tower Loan.[5]

---

[5] Indeed, the fact that the equity of Tower Borrower was worth $500,000, as valued by the credit bid, implies that the Tower is worth more than the outstanding balance of the Tower Loan. Because equity is junior to debt, the equity of Tower Borrower should only have positive value if the fair market value of Tower Borrower's assets (i.e., the Tower) were greater than the outstanding balance of the Tower Loan. At the very least, the $500,000 valuation of Tower Borrower's equity renders the proposition that the Tower is worthless implausible. See Iqbal, 556 U.S. at 678. It is of course possible — although not indicated in the complaint — that Tower Borrower has assets besides the Tower that contribute to its positive valuation, and this possibility permits the Court to infer that plaintiffs have alleged at least some minimal amount of loss with respect to the Tower Loan. If nothing else, this is sufficient for the Court to decline to dismiss Count One, which seeks the entire unpaid balance of the Tower Loan, Compl. ¶¶ 93-96, sua sponte. The precise amount of any undersecurity with respect to the Tower Loan ultimately goes to damages, and the Court therefore need not determine it at the motion-to-dismiss stage.

8

Nevertheless, the Complaint does allege a deficiency with respect to the Mezz Loan, to which the "loss" alleged in Counts Three and Four is plausibly attributable. Specifically, the Complaint states that plaintiff IMH Mezz Lender purchased the collateral securing the Mezz Loan for a credit bid of $500,000. Compl. ¶¶ 53-54, 69-70. The Court infers from this fact that the fair market value of this collateral was $500,000, leaving a deficiency of $7,990,632.78. The total amount plaintiffs seek from defendants in Counts Three and Four appears to be, at most, approximately $7 million (roughly $1.2 million of vendor liabilities plus $1 million of deferred maintenance expenses plus $4.8 million of contributions to the maintenance reserve), so plaintiffs have alleged a deficiency on the Mezz Loan sufficiently large for the Court to plausibly infer that all of the costs claimed in Counts Three and Four are "losses" in the sense of impairments to a security interest. The Court therefore declines to dismiss any portion of the Complaint on the ground that plaintiffs have failed to allege a "loss."

With respect to Count Four, defendants advance two additional grounds to dismiss. Count Four alleges that Tower Borrower's decision to defer about $1 million worth of maintenance to the property's elevator and HVAC system, and to fail to make required payments into a maintenance reserve fund, constitutes "material physical waste of the Property by

9

Borrower, Guarantor or Manager" sufficient to trigger recourse liability under § 9.3(g)(iii).

Defendants argue that the deferred maintenance alleged in the Complaint cannot constitute permissive waste as a matter of New York law.[6] Mot. at 9-10. The Court rejects this argument and declines to dismiss Count Four on this ground. "'Waste,' in its simplest definition, is whatever does a lasting damage to the freehold or inheritance. . . . The most ordinary kind of permissive waste is suffering buildings to fall into decay from neglect." Beekman v. Van Dolsen, 18 N.Y.S. 376, 377 (1st Dep't 1892); see also New York Law and Practice of Real Property § 16:13 (citing Beekman for the definition of waste). There is no doubt that a mortgagor or similar party can commit waste by failing to undertake repairs, provided that the failure to undertake such repairs results in "decay" as described in Beekman.[7] See Travelers Ins. Co. v. 633 Third Assocs., 14 F.3d

---

[6] Both parties' submissions assume that the term "waste" in § 9.3(g)(iii) incorporates the definition of this term under New York law. The Court adopts this view for the purpose of resolving this motion.

[7] Defendants also argue, correctly, that in order for a mortgagee to have an action for waste, the alleged damage must impair the security interest in the property. Mot. at 10; see Band Realty Co. v. N. Brewster, Inc., 398 N.Y.S.2d 724, 725 (2d Dep't 1977) ("The foundation of an action for waste by a mortgagee is the impairment of the security of the mortgage with knowledge of the lien.") (citation omitted). But because the issue of "loss" under § 9.3(g) subsumes the issue of whether plaintiffs'

10

114, 121 (2d Cir. 1994) ("Under New York law, an action for waste will lie against a tenant who fails to undertake certain repairs on the property."); see also United States v. Miller, 400 F. Supp. 1080, 1084 (S.D.N.Y. 1975) ("Under New York law, there is a substantive cause of action for waste against one in control of real property who does no more than allow the property to deteriorate and decrease in value . . . ."). Whether a failure to make repairs amounts to waste depends on the circumstances and the reasonability of the property holder's actions. See 34 N.Y. Jur. § 479 (discussing waste in the landlord-tenant context).

Although there are no authorities directly on point as to whether the failure to make repairs to a commercial property's elevator and HVAC system and to maintain a required reserve fund constitutes "waste" under Beekman's decay standard, plaintiffs argue persuasively that it may. On its face, the claim that a broken elevator and air conditioner in a tall office building in Missouri constitutes decay or disrepair under the circumstances is plausible.

Additionally, the cases defendants rely upon for the view that such maintenance issues cannot constitute waste are less helpful than defendants claim. Defendants first cite a recent

---

security interests were impaired, it is unnecessary to address this point here.

11

Kings County Civil Court case, Gottesman v. Graham Apts., Inc., 16 N.Y.S.3d 792 (Table), 2015 WL 1839746, at *25 (N.Y. Civ. Ct., Kings County, Apr. 5, 2015) for the proposition that waste only consists of "material and permanent injury" to a property, "over and above[] ordinary wear and tear." This language, though favorable to defendants' position, is taken out of its context; the immediately preceding paragraph, which defendants ignore, explains that "the failure to make such ordinary repairs as are necessary to prevent waste and decay of premises, that is, tenantable repairs, will constitute permissive waste." Id. Defendants also cite Staropoli v. Staropoli, 580 N.Y.S.2d 369, 370 (2d Dep't 1992) for language indicating that "the type of omission or neglect which constitutes waste" is that which results in "damage to the structure." But the kind of damage alleged in Staropoli — the failure to paint the exterior of a property — is not even remotely on point for the type of neglect alleged here, and in any case, one could plausibly view damage to an elevator or HVAC system, if sufficiently severe, as structural in nature.

Plaintiffs, for their part, cite Travelers Ins. Co., 14 F.3d at 123, which further undermines defendants' argument that only "permanent injury" and "structural damage" to a property can constitute waste. See Answer at 12-15. The Second Circuit, applying New York law, held in that case that the intentional or

12

fraudulent failure by a mortgagor to pay property taxes may constitute waste. Although factually different from a failure to repair an elevator or an HVAC system, the type of damage to the property in Travelers is similar to that alleged here in the sense that it could be resolved with a one-off expenditure of money. Travelers indicates, then, that damage need not be "permanent" in the sense of irreparable in order to form the basis for a waste claim. Of course, the severity of the damage owing to the lack of repairs, and whether such damage therefore constitutes "decay" under the circumstances, is a question of fact to be determined at a later stage of the litigation. But the balance of the authorities leads the Court to conclude that plaintiffs have plausibly alleged "material physical waste" in Count Four.

Defendants' other proffered ground for dismissing Count Four is that the Complaint fails to allege that any such waste was committed "by Borrower, Guarantor or Manager," i.e., the Hertz entities and associated management, as § 9.3(g)(iii) requires.[8] Rather, defendants argue that the allegations in the

---

[8] Apart from the "Borrower, Guarantor or Manager" language of § 9.3(g)(iii), a decision by the receiver, rather than Tower Borrower, to defer maintenance would also likely not constitute "waste" for which defendants would be liable. See Travelers Ins. Co., 14 F.3d at 124 ("To the extent that Travelers' claims of waste relate to conduct that occurred after the appointment of the receiver, they were properly dismissed.").

13

Complaint are consistent with the waste having occurred after the property entered receivership in February 2019. Mot. at 11. Plaintiffs respond that the requisite pleading is in paragraph 87 of the Complaint, which provides that:

> Plaintiffs are informed and believe that significant capital improvements that were scheduled to be completed per the property condition assessment dated May 2017 were deferred by the Tower Borrower, Mezz Borrower, and/or Defendants and never completed . . . .

See Answer at 15.

At the very least, defendants are correct that the wording of this paragraph is ambiguous. Plaintiffs could be alleging either that the May 2017 (i.e., pre-receivership) property assessment discovered that the repairs at issue were already overdue, or that the assessor in May 2017 created a schedule according to which management would conduct these repairs at some point in the future. Under the latter formulation, it is unclear whether the elevator and HVAC repairs were already overdue by the time receivership began in February 2019. Nevertheless, because this is a motion to dismiss, the Court will adopt the former reading, which is more favorable to the plaintiff. See Beazley Ins. Co., 150 F. Supp. 3d at 354. In that formulation, plaintiffs have alleged that the purported waste occurred before the receivership, and this is sufficient to sustain the claim.

14

Finally, defendants ask the Court to dismiss Count Three — which alleges unpaid vendor and tenant liabilities — on the independent grounds that the Complaint fails to plead (1) that these liabilities could result in liens on the property; and (2) that sufficient funds from the operation of the property were available to pay these costs while the Tower was under its prior ownership. Mot. at 8-9. Both of these facts are conditions precedent to guarantor liability under § 9.3(vi), which allows recourse recovery for "failure to pay charges for labor or materials or other charges or judgments <u>that can create Liens on any portion of the Property</u> (<u>to the extent sufficient funds from the operation of the Property are available to do so</u>) . . . ." (emphasis supplied).

The Court finds defendants' first argument unpersuasive. Unpaid liabilities could necessarily result in damage awards for breach of contract, which could in turn give rise to judgment liens against the property as a matter of here applicable Missouri law. See Missouri Supreme Court Rule 74.08 ("Except as provided in [other provisions], the lien of a judgment commences upon entry of the judgment, continues for a period of ten years, and is revived by a revival of the judgment.").[9]

---

[9] Defendants posited at oral argument that such liens would not necessarily have priority over other claims against the Tower, but a plausible reading of § 9.3(g) is that even junior liens are sufficient to trigger guarantor liability. See <u>Beazley Ins.</u>

15

Nevertheless, the Court is persuaded by defendants' second argument. The Complaint totally fails to allege that sufficient funds from the operation of the Tower were available to pay the vendor and tenant liabilities, and the Complaint must allege as much in order to state a claim for breach of the guaranty agreement arising from § 9.3(vi). Plaintiffs' only response is that the absence of sufficient funds would constitute an affirmative defense, but that the presence of sufficient funds need not be pled in the Complaint. Answer at 11. This view is plainly incorrect. The presence of sufficient funds to pay the liabilities in question is a necessary condition for guarantor liability under § 9.3(g)(vi), and plaintiffs must plead accordingly in order to state a claim against defendants.

The Court therefore dismisses Count Three without prejudice to amending the complaint. Courts generally grant leave to amend unless doing so would be futile or would result in prejudice to the non-pleading party. See Ellis v. Chao, 336 F.3d 114, 127 (2d Cir. 2003); Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993). Here, plaintiffs represented to the Court at oral argument that they could make the necessary amendments, and

---

Co. 150 F. Supp. 3d at 354 (directing courts to "draw all reasonable inferences in plaintiff's favor" at the motion-to-dismiss stage).

there is no suggestion of prejudice to defendants if leave to amend is granted at this early stage.

In sum, defendants' motion to dismiss is denied as to Count Four but granted as to Count Three, without prejudice, however, to plaintiffs curing the defect in an amended complaint, which must be filed by no later than November 22, 2019.

SO ORDERED.

Dated: New York, NY
November 14, 2019

JED S. RAKOFF, U.S.D.J.

17