IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IMH BROADWAY TOWER SENIOR LENDER, LLC, a Delaware limited liability company; IMH BROADWAY TOWER MEZZ LENDER, LLC, a Delaware limited liability company,<br><br>        Plaintiffs,<br><br>  v.<br><br>WILLIAM HERTZ, an individual residing in California; ISAAC HERTZ, an individual residing in California; SARAH HERTZ, an individual residing in California,<br><br>        Defendants. | No.    1:19-CV-08168 (JSR)<br><br>**PLAINTIFFS' FIRST AMENDED COMPLAINT** |

Plaintiffs, IMH Broadway Tower Senior Lender, LLC ("IMH Tower Lender") and IMH Broadway Tower Mezz Lender ("IMH Mezz Lender") (collectively, "Plaintiffs"), for their complaint against Defendants, William Hertz ("W. Hertz"), Isaac Hertz ("I. Hertz"), and Sarah Hertz ("S. Hertz") (collectively, "Defendants" or "Guarantors"), allege, aver, and state as follows:

## THE PARTIES

1.      IMH Tower Lender is a Delaware limited liability company.

2.      IMH Tower Lender's sole member is IMH Broadway Tower OZB, LLC ("IMH Tower OZB"), a Delaware limited liability company.

3.      IMH Tower OZB's members are IMH BT OZB Managing Member, Inc. ("IMH Tower Managing Member") and IMH BT OZB Member, LLC, a Delaware limited liability company ("IMH Tower Non-Managing Member").

4.      IMH Tower Managing Member is incorporated in Delaware and has a principal place of business in Arizona.

5.      IMH Tower Non-Managing Member's sole member is IMH Holdings, LLC ("IMH Holdings"), a Delaware limited liability company.

6.      IMH Holdings' sole member is IMH Financial Corporation ("IMHFC").

7.      IMHFC is incorporated in Delaware and has a principal place of business in Arizona.

8.      IMH Mezz Lender is a Delaware limited liability company.

9.      IMH Mezz Lender's sole member is IMH Holdings.

10.     As set forth above, IMH Holdings' sole member is IMH Financial Corporation ("IMHFC"), which is incorporated in Delaware and has a principal place of business in Arizona.

11.     W. Hertz is an individual with citizenship in California.

12.     I. Hertz is an individual with citizenship in California.

13.     S. Hertz is an individual with citizenship in California.

14.     Defendants contractually consented to venue and jurisdiction in any federal court in the City of New York, County of New York.

15.     The amount in controversy in this civil action exceeds $75,000.

16.     There is complete diversity amongst the parties to this civil action. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

## THE TOWER LOAN TRANSACTION

17.     On or about September 5, 2014, JPMorgan Chase Bank as lender ("Tower Lender") and Hertz Broadway Tower, LLC as borrower ("Tower Borrower") entered into that certain "Loan Agreement" dated September 5, 2014 ("Original Tower Loan Agreement").  A true and correct copy of the Original Tower Loan Agreement is attached hereto as **Exhibit 1**.

18.     On or about November 15, 2014, the Original Tower Loan Agreement was amended by that certain "Omnibus Amendment to Loan Documents" dated November 15, 2014 ("Amended Tower Loan Agreement").  A true and correct copy of the Amended Tower Loan Agreement is attached hereto as **Exhibit 2**.  The Original Tower Loan Agreement and the Amended Tower Loan Agreement are referred to herein as the "Tower Loan Agreement."

19.     On or about September 5, 2014, Tower Borrower executed and delivered that certain "Promissory Note" dated September 5, 2014 ("Original Tower Note") to Tower Lender.  A true and correct copy of the Original Tower Note is attached hereto as **Exhibit 3**.

20.     On or about November 15, 2014, Tower Borrower executed and delivered that certain "Amended and Restated Promissory Note" dated November 15, 2014 ("Amended Tower Note") to Tower Lender.  A true and correct copy of the Amended Tower Note is attached hereto as **Exhibit 4**.  The Original Tower Note and Amended Tower Note are referred to herein as the "Tower Note."

21.     On or about September 5, 2014, Tower Borrower executed and delivered that certain "Deed of Trust, Assignment of Leases and Rents and Security Agreement" dated September 5, 2014 ("Tower Deed of Trust") to Tower Borrower.  A true and correct copy of the Tower Deed of Trust is attached hereto as **Exhibit 5**.

22.     The Tower Deed of Trust was recorded at Book 09122014 of Page 0033 with the Recorder of Deeds for the City of St. Louis, Missouri.

23.     Pursuant to the Tower Deed of Trust, the Tower Borrower granted Tower Lender a mortgage on, among other things, certain real and personal property located at

- 3 -

100 North Broadway Avenue, St. Louis, Missouri 63102 ("Tower Collateral") to secure the Tower Loan (defined below).

24.     The Tower Lender further perfected its interest in the Tower Collateral by filing a UCC Financing Statement with the St. Louis City Recorder of Deeds on September 12, 2014 as Document No. 09122014-0034 and by filing a UCC Financing Statement with the Delaware Department of State on October 29, 2014 as Document No. 2014 4353421 (collectively, the "Tower UCCs").  True and correct copies of the Tower UCCs are attached hereto as **Exhibit 6**.

25.     The Tower Loan Agreement, Tower Note, Tower Deed of Trust, and the Tower Guaranty (defined below) are referred to herein as the "Tower Loan Documents."

26.     Pursuant to the Tower Loan Documents, Tower Lender loaned Tower Borrower the principal amount of sixteen million seven hundred thousand and no/100 dollars ($16,700,000.00) ("Tower Loan").

27.     In addition, § 9.3 of the Tower Loan Agreement provides that the Tower Lender is entitled to pursue Tower Borrower (or the Defendants) "to the extent of any loss, damage, cost, expense, liability, or claim or other obligation incurred" arising in connection with the following:

> (i) fraud or intentional misrepresentation by Borrower or Guarantor in connection with the Loan;
> (ii) the gross negligence or willful misconduct of Borrower or Guarantor;
> (iii) material physical waste of the Property by Borrower, Guarantor or Manager;
> (iv) the removal or disposal of any portion of the Property after an Event of Default by Borrower;

(v) the misapplication or conversion by Borrower, Mortgage Borrower or Guarantor of (A) any Insurance Proceeds paid by reason of any loss, damage or destruction to the Property, (B) any Awards received in connection with a Condemnation of all or a portion of the Property, (C) any Rents following an Event of Default, or (D) any Rents paid more than one month in advance;

(vi) failure to pay charges for labor or materials or other charges or judgments that can create Liens on any portion of the Property (to the extent sufficient funds from the operation of the Property are available to do so);

(vii) any security deposits, advance deposits or any other deposits collected with respect to the Property which are not delivered to Lender upon a foreclosure of the Property or action in lieu thereof as required by this Agreement, except to the extent any such deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of an the Event of Default that gave rise to such foreclosure or action in lieu thereof;

(viii) Borrower's failure to obtain and/or maintain the Interest Rate Cap Agreement or Replacement Interest Rate Cap Agreement, as applicable, as required pursuant to Section 2.2.7 hereof.

(ix) Borrower's failure to provide financial information, as required pursuant to the Loan Documents;

(x) Borrower's failure to permit on-site inspections of the Property; or

(xi) Borrower's failure to appoint a new manager upon request of Lender as permitted under Section 9.4 of this Agreement.

*See* Tower Loan Agreement at § 9.3.

## **DEFENDANTS' GUARANTY OF THE TOWER LOAN**

28.    On or about September 5, 2014, Defendants entered into that certain "Guaranty Agreement" dated September 5, 2014 ("Tower Guaranty").  A true and correct copy of the Tower Guaranty is attached hereto as **Exhibit 7**.

29.    Pursuant to the Tower Guaranty, Defendants "irrevocably and unconditionally guarantee[d] to [Tower] Lender and its successors and assigns the payment

- 5 -

and performance of the Guaranteed Obligations as and when the same shall be due and payable[.]"  *See* Tower Guaranty at § 1.1.

30.     The Tower Guaranty defines "Guaranteed Obligations" as "all obligations and liabilities of Borrower pursuant to § 9.3 of the Loan Agreement."  *See* Tower Loan Agreement at § 1.2.

31.     Pursuant to the Tower Guaranty, Defendants also agreed that "[i]n the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, immediately upon demand by Lender, pay Lender all costs and expenses (including court costs and attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder."  *See* Tower Guaranty at § 1.8.

## WELLS FARGO ACQUIRES THE TOWER LOAN DOCUMENTS FROM THE TOWER LENDER

32.     On or about December 8, 2014, Tower Lender assigned the Tower Loan Documents to Wells Fargo Bank, National Association, as trustee for the benefit of the registered holders of JP Morgan Chase Commercial Mortgage Securities Corp. Commercial Mortgage Pass Through Certificates, Series 2014-FL6 ("Wells Fargo Lender") pursuant to, among other things, the "Assignment of Deed of Trust Assignment of Lease and Rents and Security Agreement" ("DOT/Lease/Rents/Security Agreement Wells Fargo Assignment").  A true and correct copy of the DOT/Lease/Rents/Security Agreement Wells Fargo Assignment is attached hereto as **Exhibit 8**.

4818-7243-5357

## IMH TOWER LENDER'S ACQUISITION OF THE TOWER LOAN DOCUMENTS

33.     On or about May 23, 2019, Wells Fargo Lender assigned its rights under the Tower Loan Documents to IMH Tower Lender pursuant to, among other things, (i) that certain "Assignment and Assumption Agreement" dated May 23, 2019 ("Tower Assignment"), (ii) that certain "Omnibus Assignment" dated May 23, 2019 ("Omnibus Assignment"), (iii) that certain "Allonge" dated May 23, 2019 ("Tower Allonge"), and (iv) that certain "Assignment of Deed of Trust, Assignment of Leases and Rents and Security Agreement" dated May 23, 2019 ("Tower Deed of Trust Assignment").  True and correct copies of the Tower Assignment, Omnibus Assignment, Tower Allonge, and Tower Deed of Trust Assignment are attached hereto as **Exhibits 9–12**.

34.     Accordingly, IMH Tower Lender is now the owner and holder of the Tower Loan Documents.

## THE MEZZANINE LOAN TRANSACTION

35.     On or about September 5, 2014, JPMorgan Chase Bank as lender ("Mezz Lender") and Hertz Broadway Tower Mezzanine, LLC as borrower ("Mezz Borrower") entered into that certain "Mezzanine Loan Agreement" dated September 5, 2014 ("Original Mezz Loan Agreement").  A true and correct copy of the Original Mezz Loan Agreement is attached hereto as **Exhibit 13**.

36.     On or about November 15, 2014, Mezz Lender and Mezz Borrower entered into that certain "Omnibus Amendment to Loan Documents" dated November 15, 2014 ("Amended Mezz Loan Agreement").  A true and correct copy of the Amended Mezz Loan

Agreement is attached hereto as **Exhibit 14**.  The Original Mezz Loan Agreement and Amended Mezz Loan Agreement are referred to herein as the "Mezz Loan Agreement."

37.    On or about September 5, 2014, Mezz Borrower executed and delivered that certain "Mezzanine Promissory Note" dated September 5, 2014 ("Original Mezz Note") to Mezz Lender.  A true and correct copy of the Original Mezz Note is attached hereto as **Exhibit 15**.

38.    On or about November 15, 2014, Mezz Borrower executed and delivered that certain "Amended and Restated Promissory Note dated November 15, 2014 ("Amended Mezz Note") to Mezz Lender.  A true and correct copy of the Amended Mezz Note is attached hereto as **Exhibit 16**.  The Original Mezz Note and the Amended Mezz Note are referred to herein as the "Mezz Note."

39.    On or September 5, 2014, the Mezz Lender and the Mezz Borrower entered into that certain "Mezzanine Pledge and Security Agreement" dated September 5, 2014 ("Mezz Pledge Agreement").  A true and correct copy of the Mezz Pledge Agreement is attached hereto as **Exhibit 17**.

40.    Pursuant to the Mezz Pledge Agreement, Mezz Borrower pledged certain personal property ("Mezz Collateral") to Mezz Lender to secure the Mezz Loan.

41.    Mezz Lender's security interest in the Mezz Collateral was evidenced by that certain "UCC Financing Statement" filed with the Delaware Department of State on September 5, 2014 as File No. 2014 3568110 ("UCC Financing Statement").  A true and correct copy of the UCC Financing Statement is attached hereto as **Exhibit 18**.

42.    The Mezz Loan Agreement, Mezz Note, Mezz Pledge Agreement, UCC Financing Statement, and Mezz Guaranty (defined below) are referred to herein as the "Mezz Loan Documents."

43.    Pursuant to the Mezz Loan Documents, Mezz Lender loaned Mezz Borrower the principal amount of seven million six hundred twenty-five thousand and no/100 dollars ($7,625,000.00) ("Mezz Loan").

44.    In addition, § 9.3 of the Mezz Loan Agreement provides that the Mezz Lender is entitled to pursue Mezz Borrower (or the Defendants) "to the extent of any loss, damage, cost, expense, liability, or claim or other obligation incurred" arising in connection with the following:

> (i) fraud or intentional misrepresentation by Borrower or Guarantor in connection with the Loan;
> (ii) the gross negligence or willful misconduct of Borrower or Guarantor;
> (iii) material physical waste of the Property by Borrower or Mortgage Borrower;
> (iv) the removal or disposal of any portion of the Property by Borrower or Borrower causing Mortgage Borrower's removal or disposal of any portion of the Property, in each case after an Event of Default hereunder or under the Mortgage Loan Documents;
> (v) the misapplication or conversion by Borrower, Mortgage Borrower or Guarantor of (A) any Insurance Proceeds paid by reason of any loss, damage or destruction to the Property, (B) any Awards received in connection with a Condemnation of all or a portion of the Property, (C) any Rents following an Event of Default, or (D) any Rents paid more than one month in advance;
> (vi) failure of Borrower to cause Mortgage Borrower to pay charges for labor or materials or other charges or judgments that can create Liens on any portion of the Property (to the extent sufficient funds from the operation of the Property are available to do so);

(vii) any security deposits, advance deposits or any other deposits collected with respect to the Property which Borrower does not cause Mortgage Borrower to deliver to Mortgage Lender upon a foreclosure of the Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof;

(viii) Borrower's failure to obtain and/or maintain the Mezzanine Loan Interest Rate Cap Agreement or Mezzanine Loan Replacement Interest Rate Cap Agreement, as applicable, as required pursuant to Section 2.2.7 hereof.

(ix) Borrower's failure to provide financial information, as required pursuant to the Loan Documents;

(x) Borrower's failure to cause Mortgage Borrower to permit on-site inspections of the Property; or

(xi) Borrower's failure to cause Mortgage Borrower to appoint a new manager upon request of Lender as permitted under Section 9.4 of this Agreement.

*See* Mezz Loan Agreement at § 9.3.

## **DEFENDANTS' GUARANTY OF THE MEZZANINE LOAN**

45.     On or about September 5, 2014, Defendants entered into that certain "Mezzanine Guaranty Agreement" dated September 5, 2014 ("Mezz Guaranty").  A true and correct copy of the Mezz Guaranty is attached hereto as **Exhibit 19**.

46.     Pursuant to the Mezz Guaranty, Defendants "irrevocably and unconditionally guarantee[d] to [Mezz] Lender and its successors and assigns the payment and performance of the Guaranteed Obligations when the same shall be due and payable." *See* Mezz Guaranty at § 1.1.

47.     The Mezz Guaranty defines "Guaranteed Obligations" as "all obligations and liabilities of Borrower pursuant to § 9.3 of the Loan Agreement."  *See* Mezz Guaranty at § 1.2.

48.     Pursuant to the Mezz Guaranty, Defendants also agreed that "[i]n the event that Guarantor should breach or fail or timely perform any provisions of this Guaranty, Guarantor shall, immediately upon demand by Lender, pay Lender all costs and expenses (including court costs and attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder."  *See* Mezz Guaranty at § 1.8.

## IMH MEZZ LENDER'S ACQUISTIION OF MEZZ LOAN DOCUMENTS

49.     On or about June 29, 2017, Mezz Lender assigned its rights under the Mezz Loan Documents to IMH Mezz Lender pursuant to, among other things, (i) that certain "Mezzanine Assignment and Assumption Agreement" dated June 29, 2017 ("Mezz Assignment"), (ii) that certain "Allonge to Amended and Restated Mezzanine Promissory Note" dated June 29, 2017 ("Mezz Allonge"), and (iii) that certain UCC Financing Statement Amendment filed with the Delaware Department of State on June 29, 2017 as File No. 2017 4305063 ("UCC-3 Financing Statement").  True and correct copies of the Mezz Assignment, Mezz Allonge, and UCC-3 Financing Statement are attached hereto as **Exhibits 20–22**.

50.     Accordingly, IMH Mezz Lender is now the owner and holder of the Mezz Loan Documents.

## DEFICIENCY OWED UNDER THE TOWER GUARANTY AND TOWER LOAN DOCUMENTS

51.     As of June 21, 2019, the total amount owing under the Tower Guaranty and

Tower Loan Documents was $14,459,524.01 ("Tower Loan Balance").

52.     The Tower Loan Balance is comprised of:

| | |
|---|---|
| Total Principal Due | $13,154,113.54 |
| Default Interest Due as of 6/21/2019 | $622,211.99 |
| Late Charges on Past Due Default Interest | $25,492.80 |
| Past Due Late Charge | $657,705.68 |
| **Total Amount Due as of 6/21/2019** | **$14,459,524.01** |
| Per Diem Interest | $3,745.20 |

## DEFICIENCY OWED UNDER THE MEZZ GUARANTY AND MEZZ LOAN

53.     As of June 21, 2019, the total amount owing under the Mezz Guaranty and

Mezz Loan was $7,990,632.78 ("Mezz Loan Balance").

54.     The Mezz Loan Balance is comprised of:

| | |
|---|---|
| Total Principal Due | $7,625,000.00 |
| Total Interest Due Through 6/21/2019 | $1,106,137.02 |
| Late Charges | $432,187.83 |
| Legal Enforcement Costs | $90,117.66 |
| Other Enforcement Costs (Appraisal) | $11,800.00 |
| Interest Payment Received from Servicer | ($774,609.73) |
| Credit Bid | ($500,000.00) |
| **Total Deficiency Claim as of 6/21/2019** | **$7,990,632.78** |
| Default Interest Per Diem | $3,640.85 |

## TOWER BORROWER'S DEFAULT UNDER THE TOWER LOAN DOCUMENTS

55.     Pursuant to § 1.1 of the Tower Loan Agreement, the Tower Note matured on

September 9, 2018 ("Tower Loan Maturity Date").  *See* Tower Loan Agreement at § 1.1.

56.     Tower Borrower did not repay the Tower Loan Agreement on or before the

Tower Loan Maturity Date.

4818-7243-5357

Case 1:19-cv-08168-JSR   Document 31   Filed 11/22/19   Page 13 of 25

57.     Pursuant to § 8.1(a)(i) of the Tower Loan Agreement, an event of default occurs thereunder, among other times, "if any portion of the Debt is not paid when due[.]" *See* Tower Loan Agreement at § 8.1(a)(i).

58.     Accordingly, Tower Borrower defaulted under the Tower Loan Documents and remains in default under those Documents.

59.     On or about September 26, 2018, Wells Fargo Lender notified Tower Borrower and Defendants of the default under the Tower Loan Documents and made demand for repayment of all amounts due under the Tower Loan Documents ("Tower Notice of Default").  A true and correct copy of the Tower Notice of Default is attached hereto as **Exhibit 23**.

## MEZZ BORROWER'S DEFAULT UNDER THE MEZZ LOAN DOCUMENTS

60.     Pursuant to § 1.1 of the Mezz Loan Agreement, the Mezz Note also matured on September 9, 2018 ("Mezz Loan Maturity Date").  *See* Mezz Loan Agreement at § 1.1.

61.     Mezz Borrower did not repay the Mezz Loan Agreement on or before the Mezz Loan Maturity Date.

62.     Pursuant to § 8.1(a)(i) of the Mezz Loan Agreement, an event of default occurs thereunder, among other times, "if any portion of the Debt is not paid when due[.]" *See* Mezz Loan Agreement at § 8.1(a)(i).

63.     Accordingly, Mezz Borrower defaulted under the Mezz Loan Documents and remains in default under those Documents.

4818-7243-5357

- 13 -

64.     Pursuant to a letter dated September 10, 2018, IMH Mezz Lender notified Mezz Borrower and Defendants of a default under the Mezz Loan Documents ("Mezz Notice of Default").  A true and correct copy of the Mezz Notice of Default is attached hereto as **Exhibit 24**.

65.     Pursuant to a letter dated September 13, 2018, Mezz Borrower and Defendants acknowledged receipt of the Mezz Notice of Default and further acknowledged that the Mezz Loan was in default ("Pre-Negotiation Letter").  A true and correct copy of the Pre-Negotiation Letter is attached hereto as **Exhibit 25**.

## A RECEIVER IS APPOINTED OVER CERTAIN REAL AND PERSONAL PROPERTY OWNED BY TOWER BORROWER

66.     In late January 2019, Wells Fargo Lender moved for the appointment of a receiver over the Tower Collateral in the Circuit Court of St. Louis City for the State of Missouri ("Receivership Court") pursuant to (i) that certain "Verified Petition for Appointment of Receiver" filed on January 25, 2019 ("Petition for Receiver") and (ii) that certain "Motion for Appointment of Receiver" filed on January 28, 2019 ("Motion for Receiver").

67.     On or about February 7th, 2019, the Receivership Court appointed a receiver ("Receiver") over the Tower Collateral pursuant to that certain "Consent Order Appointing Receiver" dated February 7, 2019 ("Receivership Order").

68.     Tower Borrower and Mezz Borrower consented and/or acquiesced to the Receivership Order through Hertz Broadway Tower Manager, Inc. ("Manager"). *See* Receivership Order at p. 12.

## THE UCC SALE AND IMH MEZZ LENDER'S PURCHASE OF THE MEZZ COLLATERAL

69.　　On or about May 29, 2019, IMH Mezz Lender conducted a sale of the Mezz Collateral pursuant to New York's Uniform Commercial Code ("UCC Sale").

70.　　At the UCC Sale, IMH Mezz Lender purchased the Mezz Collateral pursuant to a credit bid of $500,000.00 ("Credit Bid").

## DEFENDANTS' DEFAULT UNDER THE TOWER GUARANTY

71.　　Section 9.3 of the Tower Loan Agreement provides that the Tower Lender may only enforce its rights against Tower Borrower to the extent of Tower Borrower's interest in the Tower Collateral except if, among other things, "Borrower consent[s] to or acquiesce[s] in or join[s] in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any portion of Property [as defined in the Tower Loan Documents." *See* Tower Loan Agreement at § 9.3.

72.　　Therefore, the Tower Guaranty is non-recourse to the Defendants except if, among other things, "Borrower consent[s] to or acquiesce[s] in or join[s] in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any portion of Property [as defined in the Tower Loan Documents." *See id.*; *see also* Tower Guaranty at § 1.2 (defining "Guaranteed Obligations").

73.　　As Tower Borrower, through Manager, consented and/or acquiesced to the appointment of the Receiver, the Tower Loan Balance owing under the Tower Loan Documents is now fully recourse to the Tower Borrower. *See* Tower Loan Agreement at § 9.3.

4818-7243-5357

74.     In addition, pursuant to § 1.2 of the Tower Guaranty, the Defendants are also personally liable for the full amount of the Tower Loan Balance.  *See* Tower Guaranty at § 1.2.

75.     On or about June 7, 2019, IMH Tower Lender notified Defendants of their default under the Tower Guaranty and made demand for payment of the Tower Loan Balance ("<u>First Demand Letter</u>").  A true and correct copy of the First Demand Letter is attached hereto as **Exhibit 26**.

76.     Despite demand, Defendants have not repaid any portion of the Tower Loan Balance.

### **DEFENDANTS' DEFAULT UNDER THE MEZZANINE GUARANTY**

77.     Section 9.3 of the Mezz Loan Agreement provides that the Mezz Lender may only enforce its rights against Mezz Borrower to the extent of Mezz Borrower's interest in the Mezz Collateral except if, among other things, "Borrower consent[s] to or acquiesce[s] in or join[s] in or Borrower caus[es] [Tower Borrower] to consent to or acquiesce in or join in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any portion of the Property [as defined in the Mezz Loan Documents]."  *See* Mezz Loan Agreement at § 9.3.

78.     Therefore, the Mezz Guaranty is non-recourse to Defendants except if, among other things, "Borrower consent[s] to or acquiesce[s] in or join[s] in or Borrower caus[es] [Tower Borrower] to consent to or acquiesce in or join in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any portion of

4818-7243-5357

the Property [as defined in the Mezz Loan Documents]." *See id*.; *see also* Mezz Guaranty at § 1.2 (defining "Guaranteed Obligations").

79.     As Mezz Borrower, through Manager, consented and/or acquiesced to the appointment of the Receiver, the Mezz Loan Balance owing under the Mezz Loan Documents is now fully recourse to the Mezz Borrower. *See* Mezz Loan Agreement at § 9.3.

80.     In addition, pursuant to § 1.2 of the Mezz Guaranty, the Defendants are also personally liable for the full amount of the Mezz Loan Balance. *See* Mezz Guaranty at § 1.2.

81.     On or about June 7, 2019, pursuant to the First Demand Letter, IMH Mezz Lender notified Defendants of their default under the Mezz Guaranty and made demand for payment of the Mezz Loan Balance. *See* First Demand Letter.

82.     Despite demand, Defendants have not repaid any portion of the Mezz Loan Balance.

### PLAINTIFFS DISCOVER DAMAGES DUE TO UNPAID EXISTING LIABILITIES AND DEFERRED MAINTENANCE ISSUES

83.     After the maturity default by Tower Borrower, Plaintiffs discovered millions of dollars of damage resulting from certain existing liabilities and deferred maintenance issues at that certain property which, among other things, constitutes the Tower Collateral and Mezz Collateral ("Property").

84.     During the Plaintiffs' due diligence resulting from Tower Borrower's default, Plaintiffs discovered certain unpaid existing tenant/vendor liabilities in the amount

of $1,238,613.00 ("Unpaid Tenant/Vendor Liabilities") prior to the calculation of default interest which has accrued per the terms of each respective agreement.

85.     The Unpaid Tenant/Vendor Liabilities include (but may not be limited to): (i) $915,800.00 plus at least $133,155 in default interest for a total of not less than $1,048,955 due to AECOM, (ii) $201,661.50 plus at least $25,000.00 in default interest for a total of not less than $226,661.50 due to Guarantee Construction, (iii) $9,068.86 due to Engraphix Architectural Signage, (iv) $1,595.00 due to RJP Electric, (v) $13,877.00 due to Universal Services of America, and (vi) $96,611.00 due to Nestle.

86.     In addition to the foregoing Unpaid Tenant/Vendor Liabilities, Plaintiffs continue to investigate after the UCC Sale and may discover additional accrued, accruing, and unpaid liabilities.

87.     At or about the time the Unpaid Tenant/Vendor Liabilities were incurred, Plaintiffs are informed and believe that the Tower Borrower and/or Mezz Borrower had sufficient funds available to Tower Borrower and/or Mezz Borrower or their agent(s) from the operation of the Property to satisfy such Liabilities.

88.     Further, Plaintiffs are informed and believe that significant capital improvements that were scheduled to be completed per the property condition assessment dated May 2017 were deferred by the Tower Borrower, Mezz Borrower, and/or Defendants and never completed (the "Deferred Maintenance Claims").

89.     Pursuant to a property condition assessment report dated August 2019, Plaintiffs are informed and believe that the Deferred Maintenance Claims include immediate and short-term repairs in the estimated amount of $987,291.00.  Such immediate and short-term repairs include, among other things, repairs to (i) the HVAC system ($898,023) and (ii) the elevator and conveyor system ($68,640).

90.     Further, pursuant to the August 2019 report, Plaintiffs are informed and believe that the Deferred Maintenance Claims include replacement reserves in excess of $4,800,000.00 with respect to several aspects of the Property.  The Deferred Maintenance

Claims for required replacement reserves include, among other things: (i) elevator and conveying system ($1,793,568), (ii) HVAC system ($1,526,800), roofing ($571,486.00), and facades ($141,831).

91.     Plaintiffs investigation of the Property is ongoing, and Plaintiffs expect to discover other Deferred Maintenance Claims.

92.     Pursuant to a letter dated July 8, 2019 ("Second Demand Letter"), Plaintiffs made demand on the Defendants for payment of the Unpaid Tenant/Vendor Liabilities and the Deferred Maintenance Claims which, at the time, totaled $3,200,000.00.  A true and correct copy of the Second Demand Letter is attached hereto as **Exhibit 27**.

93.     Despite demand, Defendants have failed to pay the Unpaid Tenant/Vendor Liabilities and/or the Deferred Maintenance Claims.

**FIRST CAUSE OF ACTION**

**(Breach of the Tower Guaranty – Tower Loan Balance)**

94.     Plaintiff re-alleges and incorporates the preceding allegations as though set fully forth herein.

95.     There is a contract between Plaintiff and Defendants as evidenced by, among other things, the Tower Guaranty.

96.     Defendants breached the Tower Guaranty, and defeated its purpose by, among other things, failing to pay amounts owed when due.

97.     Plaintiff has been damaged in an amount to be proven at trial that is no less than the Tower Loan Balance.  Default interest, late fees, attorneys' fees, and costs continue to accrue on the Tower Loan Balance.

**SECOND CAUSE OF ACTION**

**(Breach of the Mezz Guaranty – Mezz Loan Balance)**

98.     Plaintiff re-alleges and incorporates the preceding allegations as though set fully forth herein.

99.     There is a contract between Plaintiff and Defendants as evidenced by, among other things, the Mezz Guaranty.

100.    Defendants breached the Mezz Guaranty, and defeated its purpose by, among other things, failing to pay amounts owed when due.

101.    Plaintiff has been damaged in an amount to be proven at trial that is no less than the Mezz Loan Balance.  Default interest, late fees, attorneys' fees, and costs continue to accrue.

## THIRD CAUSE OF ACTION

### (Breach of Mezz and Tower Guaranties – Unpaid Tenant/Vendor Liabilities)

102.    Plaintiff re-allege and incorporate the preceding allegations as though set forth fully herein.

103.    Section 9.3(vi) of the Tower Loan Agreement provides that Tower Lender (or its successor-in-interest) is entitled to pursue Tower Borrower (and thus Defendants) for any loss incurred because of Tower Borrower's "failure to pay charges for labor or materials or other charges of judgments that can create Liens on any portion of the Property (to the extent sufficient funds from the operation of the Property are available to do so."

104.    Similarly, § 9.3(vi) of the Mezz Loan Agreement provides that IMH Mezz Lender is entitled to pursue Mezz Borrower (and thus Defendants) for any loss incurred because of Mezz Borrower's "failure of Borrower to cause Mortgage Borrower to pay charges for labor or materials or other charges or judgments that can create Liens on any portion of the Property (to the extent sufficient funds from the operation of the Property are available to do so)."

4818-7243-5357

105.    Plaintiffs have discovered $1,238,613.00 ("<u>Unpaid Tenant/Vendor Liabilities</u>") prior to the calculation of default interest which has accrued per the terms of each respective agreement, in unpaid tenant/vendor liabilities with respect to the Property—*i.e.*, the Unpaid Tenant/Vendor Liabilities.

106.    Defendants are liable for the Unpaid Tenant/Vendor Liabilities pursuant to § 9.3(vi) of the Mezz Loan Agreement and the Tower Loan Agreement and pursuant to the Mezz Guaranty and Tower Guaranty.

107.    Defendants have breached the Mezz Guaranty and the Tower Guaranty, and defeated their purpose by, among other things, failing to pay the Unpaid Tenant/Vendor Liabilities that are due and owing thereunder.

108.    At or about the time the Unpaid Tenant/Vendor Liabilities were incurred, Plaintiffs are informed and believe that the Tower Borrower and/or Mezz Borrower had sufficient funds available to Tower Borrower and/or Mezz Borrower or their agent(s) from the operation of the Property to satisfy such Liabilities.

109.    Plaintiffs have been damaged in an amount to be proven at trial as a result of the Defendants' failure to pay the Unpaid Tenant/Vendor Liabilities and resulting breach of the Mezz Guaranty and the Tower Guaranty.

## **FOURTH CAUSE OF ACTION**
### **(Waste – Deferred Maintenance Claims)**

110.    Plaintiffs re-allege and incorporate the preceding allegations as though set forth fully herein.

4818-7243-5357

111.    Section 9.3(iii) of the Tower Loan Agreement provides that Tower Lender (or its successor-in-interest) is entitled to pursue Tower Borrower (and thus Defendants) for any loss incurred because of "material physical waste of the Property by Borrower, Guarantor or Manager[.]"

112.    Similarly, § 9.3(iii) of the Mezz Loan Agreement provides that Mezz Lender (or its successor-in-interest) is entitled to pursue Mezz Borrower (and thus Defendants) for any loss incurred because of "material physical waste of the Property by Borrower or Mortgage Borrower[.]"

113.    Defendants failed to pay the Deferred Maintenance Claims and thus have materially decreased and impaired the value of the Property.

114.    Plaintiffs are entitled to damages as a result of Defendants' failure to pay the Deferred Maintenance Claims.

## FIFTH CAUSE OF ACTION

### (Attorneys' Fees and Collection Costs)

115.    Plaintiffs re-allege and incorporate the preceding allegations as though set fully forth herein.

116.    Pursuant to the Tower Guaranty, Defendants agreed to "pay Lender all costs and expenses (including court costs and attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder." *See* Tower Guaranty at § 1.8.

117.    Pursuant to the Mezz Guaranty, Defendants agreed to "pay Lender all costs and expenses (including court costs and attorneys' fees) incurred by Lender in the

4818-7243-5357

enforcement hereof or the preservation of Lender's rights hereunder." *See* Mezz Guaranty at § 1.8.

118.   Accordingly, Plaintiffs are entitled to judgment against Defendants pursuant to the Tower Guaranty and Mezz Guaranty for its costs, fees, expenses, and disbursements, including attorneys' fees, incurred to enforce and protect Plaintiff's rights under the Tower Loan Documents, Tower Guaranty, Mezz Loan Documents, and Mezz Guaranty in an amount to be determined.

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

(i)   For judgment against Defendants, jointly and severally, for all amounts owed under the Mezz Guaranty;

(ii)   For judgment against Defendants, jointly and severally, for all amounts due and owing under the Tower Guaranty; and

(iii)   For judgment against Defendants, jointly and severally for the waste to the Property;

(iv)   For an award of Plaintiffs' attorneys' fees and costs against Defendants, jointly and severally; and

(v)   For such other and further relief as is just and equitable.

Dated: Phoenix, Arizona
        November 22, 2019

SNELL & WILMER L.L.P.


By: *Christopher H. Bayley*
Christopher H. Bayley (admitted *pro hac vice*)
James G. Florentine (admitted *pro hac vice*)
One Arizona Center
Phoenix, Arizona 85004
(602) 382-6000
cbayley@swlaw.com
jflorentine@swlaw.com

-and-

GIBSON, DUNN & CRUTCHER LLP
Matthew K. Kelsey
Jonathan Fortney
200 Park Avenue
New York, New York 10166
(212) 351-4000
mkelsey@gibsondunn.com
jfortney@gibsondunn.com

4818-7243-5357

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 22, 2019, I caused a true and correct copy of the

foregoing "Plaintiffs' First Amended Complaint" to be served upon counsel via email and U.S.

Mail as follows:

Thaddeus D. Wilson
Kevin J. O'Brien
KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309
thadwilson@kslaw.com
kobrien@kslaw.com

And

Israel Dahan
KING & SPALDING, LLP
1185 Avenue of the Americas
New York, New York 10036
idahan@kslaw.com

<u>/s/ *Paula Shanahan*          </u>

4818-7243-5357